**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GEORGE EDWARD MICHAEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13 C 7212 |
| v. | ) | |
| | ) | |
| UNITED PARCEL SERVICE FREIGHT, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On March 17, 2014, Plaintiff George Edward Michael ("Michael") filed a two-count First

Amended Complaint alleging that Defendant United Parcel Service Freight, Inc. ("UPSF")

discriminated and retaliated against him in violation of the Age Discrimination in Employment

Act, 29 U.S.C. § 621, *et seq.* ("ADEA"). Before the Court is UPSF's motion for summary

judgment brought pursuant to Federal Rule of Civil Procedure 56(a). For the following reasons,

the Court grants UPSF's summary judgment motion and dismisses this lawsuit in its entirety.

## BACKGROUND

### I.      Northern District of Illinois Local Rule 56.1

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the

advantage of the parties' familiarity with the record and often cannot afford to spend the time

combing the record to locate the relevant information,' in determining whether a trial is

necessary." *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Local

Rule 56.1(a) requires the moving party to provide "a statement of material facts as to which the

moving party contends there is no genuine issue and that entitle the moving party to a judgment

as a matter of law." *Petty v. City of Chicago,* 754 F.3d 416, 420 (7th Cir. 2014). "The non-moving party must file a response to the moving party's statement, and, in the case of any disagreement, cite 'specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (citation omitted); *see also* L.R. 56.1(b)(3)(A). Local Rule 56.1(b)(3)(c) "requires specifically that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate 'statement ... of any additional facts that require the denial of summary judgment.'" *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012) (citation omitted). "The obligations set forth by a court's local rules are not mere formalities." *Zuppardi v. Wal-Mart Stores, Inc.,* 770 F.3d 644, 648 (7th Cir. 2014). With these standards in mind, the Court turns to the relevant facts of this case.

## II.     Relevant Facts

### A.     Michael's UPSF Background

In 2002, Overnight Transportation Company hired Michael as a terminal manager in Nanuet, New York and transferred him to the position of manager at the South Holland, Illinois hub facility in 2003. (R. 70, Def.'s Rule 56.1 Stmt. Facts ¶ 5.) UPSF acquired Overnight Transportation Company in 2005 and retained Michael in his South Holland position until 2008. (*Id.*) UPSF is in the business of transporting and delivering freight shipments across the country by maintaining a network of service centers in various regions throughout the United States. (*Id.* ¶ 4.) Each UPSF service center has one manager who is responsible for overseeing all aspects of freight operations and ensuring the service center is operating in compliance with UPSF's business, financial, and service quality standards. (*Id.*)

In 2008, the Region Vice President ("RVP") responsible for Michael's area, Steve Smith, asked Michael if he would be interested in transferring to a labor manager position, which was a newly-created position because UPSF had recently entered into a collective bargaining agreement with the Teamsters Union. (*Id*. ¶ 6.) Michael agreed to the transfer because he believed experience in the labor function would help his chances at promotion. (*Id*.) In this new position, Michael was responsible for labor relations for UPSF's West Region. (*Id*. ¶ 7.) Michael's specific job responsibilities included investigating grievances and other labor matters, representing UPSF in grievance meetings and hearings, and interacting with the two primary unions–the International Brotherhood of Teamsters and the International Association of Machinists. (*Id*.) Michael's supervisor rated him "somewhat ineffective" in his 2008 Quality Performance Review ("QPR") and "development needed" in his 2009 QPR. (*Id*. ¶ 8.)

## B. Transfer to Chicago Terminal Service Center

In April 2009, UPSF transferred Michael to the service center manager position for the Chicago terminal. (*Id*. ¶ 9.) As Chicago's service center manager, Michael was responsible for the facility and supervised a team of eleven assistant managers and supervisors. (*Id*.) UPSF transferred Michael to the Chicago terminal to turn its performance around because the facility was not performing up to UPSF's expectations. (*Id*. ¶ 11.) At the time of Michael's new assignment, Kevin Hartman was the Division Vice President ("DVP") for the West Division and responsible for the company's freight operations for the western half of the United States, including the Chicago terminal. (*Id*. ¶ 10.) Hartman supervised RVP Smith, who supervised the Regional Director of Operations ("RDO"), who during part of the relevant time period was Ken Brown. (*Id*.; R. 80, Pl.'s Rule 56.1 Stmt. Add'l Facts ¶ 1.) As Michael's direct supervisor, RDO

Brown rated Michael as a "fully acceptable performer" in Michael's 2009 QPR. (Pl.'s Stmt. Facts ¶ 1, R. 81-5, Pl.'s Ex. 5, Bates UPSF 1402-03.) Brown testified that at that time he felt Michael contributed to the improvement of the Chicago terminal's performance. (*Id*. ¶ 2.) In August 2009, Brown met with Michael to discuss his career development assessment, stating that Michael was still developing and was one or two years away from a promotion. (Def.'s Stmt. Facts ¶ 23.) In addition, in 2010, Hartman rated Michael as "developing one to two years" in terms of his readiness for promotion. (Pl's Stmt. Facts ¶ 3; Def.'s Stmt. Facts ¶ 21.) Hartman explained that as of spring 2010, Michael had been on the job about a year and was still struggling. (Def.'s Stmt. Facts ¶ 21.) It is undisputed that during the relevant time period, Hartman was ultimately responsible for making promotion and demotion decisions for service center managers, RDOs, and RVPs in UPSF's West Division. (Def.'s Stmt. Facts ¶ 12.) Hartman based his decisions, in part, on recommendations from the RVPs or RDOs who reported to him. (*Id*.)

C.    **Chicago Service Center's Performance**

While Overnight Transportation Company measured and ranked its service centers (and, by extension, the performance of the service center managers) almost solely on revenue, UPSF focuses on the costs associated with that revenue, financial profitability, and other elements that are long-term in nature and not directly tied to profit and loss. (*Id.* ¶ 13.) These elements include leadership, career development of the entire manager team, growth factors, health and safety processes, regulatory compliance, compliance with UPSF's internal processes, and retention of staff. (*Id.*) Performance with regard to these elements is measured by Business Process Review ("BPR") audits and via a report called the "balanced scorecard" or "BSC"

report.  (*Id.*)  BSC reports track performance data for the elements discussed above and are generated weekly and monthly.  (*Id.*)  UPSF uses BSC data and the annual BSC reports to compare the performance of its various terminals.  (*Id.* ¶ 15.)  In 2010, this comparative data showed that the Chicago terminal ranked poorly in comparison to other terminals–the Chicago terminal was ranked at 122 out of 201 service centers.  (*Id.*)

UPSF conducts a detailed, three-day BPR audit of its service centers as another tool to evaluate whether its centers are in compliance with the requisite UPSF operational processes and procedures, safety requirements, cost and financial controls, regulatory compliance, and customer service.  (*Id.* ¶ 36.)  The BPR audit is a "snapshot" of a service center's compliance at the time of the audit, but does not measure performance indicators for growth, gains in productivity, or cost controls.  (*Id.*)  A team comprised of UPSF corporate auditors and one guest auditor, who is a service center manager from a different facility, conducts the BPR audits that cover four areas:  (1) financial; (2) service quality; (3) safety and security; (4) and internal business processes.  (*Id.* ¶ 37.)  The audit team examines the numerous processes within each of these four sections by observation and examination of records for the previous few weeks.  (*Id.*)  The audit team then scores each area from one to six with one being a "critical" area of concern, two being a "severe" area of concern, three being a "substantial" area of concern, and six being a "commendable" rating.  (*Id.*)  After the audit team completes the BPR, they share the results with the management team for that division by discussing the results on a "recap" call.  (*Id.* ¶ 38.)  When a BPR audit reveals problems that are serious enough to be "severe" or "critical," UPSF requires the service center manager to develop and put in place a corrective action plan to address the problems.  (*Id.* ¶ 39.)

In 2009 and 2010, UPSF required service centers in the West Division to perform a yearly self-audit covering all of the areas examined in a BPR audit, and Hartman also required that service centers perform weekly audits on select portions of BPR-examined processes. (*Id.* ¶ 40.) Although several members of a service center management team ensure that processes within certain areas of the self-audit are completed, the service center manager is required to sign off on the entire self-audit and is ultimately responsible for making sure the center is in compliance. (*Id.* ¶ 41.)

A BPR team audited the Chicago service center from September 13, 2010, through September 16, 2010, and gave the Chicago service center an overall score of 73.5%. (*Id.* ¶ 42.) More specifically, the audit team reported three Code-2 level violations in the safety and security section of the audit, indicating "severe" deficiencies in three separate processes, as well as eleven deficiencies scored as Code-3 level violations. (*Id.* ¶ 43.) Hartman was concerned with these violations because of the specific emphasis UPSF placed on safety, including employees wearing seat belts around the facility, filling out logs showing how many hours of work they had completed as required under federal transportation law, and completing vehicle condition reports on UPSF equipment before and after use, which federal law also requires. (*Id.* ¶ 44.)

The audit team and management held the audit recap call on September 16, 2010. (*Id.* ¶ 46.) Hartman explained that he was disappointed by the audit results, particularly that the Chicago service center received three Code 2-level violations. (*Id.* ¶ 47.) In addition, Hartman was disturbed by how Michael conducted himself on the audit recap call because Michael was unaware of certain problem areas that he had delegated to assistant center managers. (*Id.*) Specifically, after the recap call, Hartman had the impression that Michael distanced himself

from the facility's weaknesses and did not take responsibility. (*Id.* ¶ 48; R. 71-9, Ex F, Hartman Dep., at 130.) Hartman further explained that the Chicago facility's self-audit was significantly higher than the actual audit results and that this discrepancy showed Michael was failing as a leader by delegating tasks to the management team without appropriate oversight. (*Id.* ¶ 49.)

### D.     2010 MIP Bonus

UPSF service center managers are eligible to receive a discretionary bonus, called a "management incentive plan" ("MIP") bonus, that is subject to the approval of that individual's management team. (*Id.* ¶ 51.) Michael's new RDO David Boyle and RVP Smith recommended to Hartman that Michael should not receive his MIP bonus for 2010, after which Hartman denied Michael's MIP bonus based on Michael's lack of overall leadership, failure to manage established safety processes and procedures, the results of the 2010 BPR audit, and the disparity between the BPR audit and the self-audit. (*Id.* ¶ 52.) In September 2010, Michael's management team notified him that he would not receive a MIP bonus for the year. (*Id.* ¶ 53.)

### E.     Driver Accident

In the meantime, at some point in 2010, UPSF driver Dan Rak had a serious accident that destroyed UPSF property and spilled a load of freight on the road. (*Id.* ¶ 55.) UPSF terminated Rak's employment based on the accident because UPSF had deemed the accident avoidable. (*Id.*) Rak filed a union grievance regarding his termination and a grievance hearing was held in late September or early October 2010. (*Id.*) Michael was responsible for producing to the union Rak's driver's log, which was critical to UPSF's position at the grievance hearing. (*Id.* ¶ 56.) Michael delegated the assignment to a Chicago terminal supervisor, who failed to deliver the log to the appropriate union official. (*Id.*; Pl.'s Stmt. Facts ¶¶ 8-10.) As such, UPSF could not use

the driver's log at the grievance hearing, and thus had to reinstate Rak to his position. (*Id.* ¶¶ 56, 57.)

###### F.     Demotion to Toledo, Ohio Facility

After the labor hearing failure, Boyle and Smith recommended to Hartman that Michael be demoted. (*Id.* ¶ 58.) Smith and Boyle supported their recommendation by pointing to the lack of improvement in the Chicago service center's BSC performance numbers, the poor BPR audit score and self-audit discrepancy, and the failure to ensure the timely production of the driver's log for the union grievance hearing. (*Id.*) At that time, Hartman had independent knowledge of the facts supporting the recommendation based on his own observations, review of the BSC numbers throughout Michael's tenure, involvement in the September 2010 BPR audit and recap call, and knowledge of the Rak labor matter. (*Id.* ¶ 59.) Hartman made the ultimate decision to demote Michael because he believed a change in leadership in Chicago was necessary due to the lack of improvement in the Chicago terminal's performance, BPR audit results, the labor incident, and overall lack of leadership and accountability that Michael had demonstrated. (*Id.*)

Once Harrington decided to demote Michael, Human Resources Director Benita Joseph was responsible for finding Michael a service center manager position at a smaller facility. (*Id.* ¶ 60.) Joseph's search revealed that the only available service center manager position at a smaller facility was in Toledo, Ohio. (*Id.* ¶ 61.) Due to a pressing need to get a service center manager in that position as quickly as possible, management approved Michael for the position as long as he started immediately. (*Id.*) Frequently, UPSF relocates its management team to help individuals gain additional experience and promotion opportunities, as well as to fill UPSF's

needs. (*Id.* ¶ 62.) In some instances, UPSF will offer a relocation package to compensate for the relocation costs, but UPSF usually does not offer relocation packages when the relocation is due to a demotion. (*Id.*; Pl.'s Stmt. Facts ¶ 14.)

After consulting with Joseph, Human Resources Manager James Marino and Boyle met with Michael on Tuesday, November 30, 2010, and told Michael that UPSF was reassigning him to the service center manager position at the Toledo, Ohio facility. (Def.'s Stmt. Facts ¶ 64.) Boyle and Marino told Michael to think about this reassignment and let them know by Friday, December 3, 2010, whether he was going to accept the reassignment. (*Id.*) Marino also presented Michael with an Agreement and General Release offering him the Toledo job and the attendant pay and benefits, as well as 30 days of lodging in Toledo, as consideration for the release of certain claims. (*Id.*; R. 81-8, Pl.'s Ex. 8, Agreement & General Release.) Also during this meeting, Michael asked what his retirement benefits would be if he worked another year and a half in the new assignment (until he turned 60) and asked for information regarding his potential benefits if he followed that course. (*Id.* ¶ 65.) On Friday, December 3, 2010, Michael met with Boyle and Marino and told them that he was not going to sign the release and was unsure if he would report to Toledo. (*Id.* ¶ 66.) In response, Boyle and Marino told him that the only job UPSF had for him was the Toledo position and that he needed to report to work on Monday, December 6, 2010, if he was going to accept it. (*Id.*) Over the weekend, Michael called Marino and told him that he would accept the assignment and report to Toledo on that Monday. (*Id.* ¶ 67.) It is undisputed, however, that Michael never signed the release. Although Michael remained in the same service center manager position he held in Chicago, the Toledo position was a demotion because it was a Grade 310 position for compensation purposes, while

the Chicago position was a Grade 320 position. (*Id.* ¶ 68.) The new position required a pay decrease to fit Michael within the Grade 310 salary range, and thus UPSF decreased Michael's salary from $120,000 to $93,000. (*Id.*; Pl.'s Stmt. Facts ¶ 17.) Michael remained as the service center manager of the Toledo facility until he retired from UPSF in April 2012. (*Id.* ¶ 69.) At the Toledo facility, Michael's job responsibilities remained the same as in his Chicago position, and he received his discretionary MIP bonus for 2011. (*Id.* ¶ 70.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). A court's "job when assessing a summary judgment motion is not to weigh evidence, make credibility determinations, resolve factual disputes and swearing contests, or decide which inferences to draw from the facts." *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

**ANALYSIS**

**I.        ADEA Discrimination Claim–Count I**

In Count I of his First Amended Complaint, Michael alleges an ADEA discrimination claim. The ADEA makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *See* 29 U.S.C. § 623(a)(1). Under the ADEA, Michael must present evidence from which a jury could reasonably infer that but for his age, the adverse employment action would not have occurred. *See Gross v. FBL Fin., Servs. Inc.*, 557 U.S. 167, 176, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009); *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 880 (7th Cir. 2014). A plaintiff may establish an ADEA discrimination claim under either the direct or indirect method of proof. *See Hutt v. AbbVie Prods. LLC,* 757 F.3d 687, 691 (7th Cir. 2014). Michael chooses the direct method, under which he must make his case "by pointing to evidence directly showing that [his] employer subjected [him] to an adverse employment action on an impermissible discriminatory basis." *Andrews v. CBOCS West, Inc.,* 743 F.3d 230, 234 (7th Cir. 2014). Under the direct method, Michael may present either direct or circumstantial evidence sufficient to permit the trier of fact to conclude that unlawful discrimination motivated UPSF. *See Hutt,* 757 F.3d at 691. Circumstantial evidence includes:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly-situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Id.* (citation omitted). "[W]hen all is said and done, the fundamental question at the summary

judgment stage is simply whether a reasonable jury could find prohibited discrimination." *Bass v. Joliet Pub. Sch. Dist. No. 86,* 746 F.3d 835, 840 (7th Cir. 2014).

Regardless of whether a plaintiff proceeds under the direct or indirect method of proof, he must show that he suffered an adverse employment action as a result of the alleged discrimination. *See Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014). "Adverse employment actions 'generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge.'" *Alexander v. Casino Queen, Inc.,* 739 F.3d 972, 980 (7th Cir. 2014) (citation omitted). Michael has identified three adverse employment actions upon which he bases his age discrimination claim, including the denial of the 2010 MIP bonus, his demotion to the Toledo facility, and constructive discharge.[1] UPSF does not dispute that the denial of the 2010 MIP bonus and demotion are adverse employment actions. The Court therefore turns to whether Michael has set forth sufficient evidence from which a reasonable jury could infer that his age was the "but for" cause of his 2010 demotion to the Toledo facility and denial of his 2010 MIP bonus. *See Ripberger*, 773 F.3d at 880.

### A.     Denial of 2010 Bonus and Demotion to Toledo Facility

Michael first argues that UPSF has offered shifting or inconsistent explanations for the denial of his MIP bonus and demotion to Toledo establishing that UPSF's reasons for the

_____

[1] Plaintiff voluntarily dismisses his age-based failure to promote claims. (R. 78, Resp. Brief, at 4 n.1.)

adverse employment actions are pretext for age discrimination. *See Cung Hnin v. TOA (USA),*

*LLC,* 751 F.3d 499, 506 (7th Cir. 2014) ("inquiry into pretext requires that we evaluate the

honesty of the employer's explanation, rather than its validity or reasonableness.") (citation

omitted). "As a general rule, a reasonable trier of fact can infer pretext from an employer's

shifting or inconsistent explanations for the challenged employment decision." *Castro v. DeVry*

*Univ. Inc.,* ___ F.3d ___, 2015 WL 2231823, at *15 (7th Cir. May 13, 2015); *see also Vaughn v.*

*Vilsack,* 715 F.3d 1001, 1008 (7th Cir. 2013) ("Inconsistent or shifting employer explanations, in

some cases, can provide a reasonable basis for finding pretext."). On the other hand, an

employer's supplemental or different reasons for an employment decision do not raise an

inference of pretext as long as these reasons are consistent, especially if the reasons focus on the

same underlying conduct. *See Castro,* 2015 WL 2231823, at *15 (citing *O'Connor v. DePaul*

*Univ.,* 123 F.3d 665, 671 (7th Cir. 1997)); *Vaughn,* 715 F.3d at 1008.

Michael argues that, at first, the only reason UPSF provided for the denial of his MIP

bonus and his demotion was the poor September 2010 BPR audit score of the Chicago facility.

On the other hand, during discovery UPSF produced his 2010 MIP Clarification Worksheet,

which stated the denial of his bonus was because he "failed to manage established safety process

and procedures."[2] (Pl.'s Stmt. Facts ¶ 25.) After he filed his EEOC Charge, Michael contends

that UPSF claimed a number of "new justifications" for the adverse employment actions,

---

[2] Relying on *Hutchens v. Chicago Bd. of Educ.*, 781 F.3d 366, 373 (7th Cir. 2015),
Michael argues that UPSF's failure to produce any documents, except this clarification
worksheet, to corroborate the reasons for the adverse employment actions creates a question of
fact for trial. Unlike the facts in *Hutchens*, however, there is an abundance of consistent,
testimonial evidence by numerous UPSF employees, including Human Resources Director
Benita Joseph, that painstakingly details the process of why and how UPSF denied Michael his
2010 MIP bonus and demoted him to the Toledo facility.

including that Michael's "job performance as a Service Center Manager for a key UPS Freight facility was sorely lacking" and Michael failed to "ensure that important driver records were produced to the union prior to [a] driver's grievance hearing." (*Id.* ¶ 28.) Furthermore, Michael argues that after he filed this lawsuit, Hartman asserted an entirely new justification for the adverse employment actions, namely, that Michael did not accept responsibility for Chicago's September 2010 BPR audit results and that Michael had demonstrated a lack of accountability. Michael argues that these shifting reasons create an issue of fact as to the truthfulness of UPSF's reasons for his demotion and denial of his bonus.

Viewing the facts and all reasonable inferences in Michael's favor, UPSF's explanations are not only consistent and focus on the same underlying conduct, namely, Michael's lack of leadership in managing the Chicago terminal and Hartman's loss of confidence in Michael's ability to run the Chicago terminal, Michael mis-characterizes the record in making his "shifting explanations" argument. To clarify, before denying his bonus, evidence in the record reveals that after the September 2010 BPR audit, Boyle thought Michael was not taking ownership regarding the audit results and that certain processes were not in place, Marino conducted an investigation reviewing Michael's performance in relation to the BPR audit by interviewing Michael's direct supervisors, and then Boyle and Smith talked to Hartman about Michael's performance, after which Hartman decided to deny Michael's bonus due to his lack of overall leadership. (Def.'s Stmt. Facts ¶ 52; R. 71-10, Ex. G, Joseph Dep., at 64-78; R. 71-9, Ex. F, Hartman Dep., 147-48.) The fact that Michael later learned from an internal document that one of the specific reasons for the denial of his bonus was because he "failed to manage established safety process and procedures" is not inconsistent with the evidence that UPSF denied his bonus

based on the September 2010 BPR audit, Michael's performance, and his lack of leadership.  In other words, this is not "an abrupt change in explanation" that would permit an inference of untruthfulness.  *See Schuster v. Lucent Tech., Inc.,* 327 F.3d 569, 579 (7th Cir. 2003).

Moreover, evidence in the record demonstrates that UPSF's reason for demoting Michael to the Toledo facility was based on the lack of improvement in the Chicago service center's BSC performance numbers, the poor September 2010 BPR audit score and self-audit discrepancy, and Michael's failure to ensure a driver's log was timely produced for a union grievance hearing. Again, none of these reasons are inconsistent justifications for Michael's demotion, but instead show that UPSF repeatedly defended its decision to demote and deny Michael's 2010 bonus in a consistent manner.

Nevertheless, Michael argues that UPSF's justification regarding his failure to produce the driver's log to the appropriate union representative is dishonest.  *See Cung Hnin,* 751 F.3d at 506 (plaintiff can establish pretext with evidence that employer's proffered reason is phony or a lie).  In particular, Michael maintains that on the Thursday prior to Rak's grievance hearing, he contacted UPSF's union business agent and asked if the agent wanted the driver's log faxed or hand-delivered, after which the agent said that he could fax the records.  (Pl.'s Stmt. Facts ¶ 8.) Michael then asked a supervisor in the Chicago terminal, Willie McPherson, to fax the documents to the union business agent.  (*Id.*)  Michael asserts that on the following Monday, he followed-up with McPherson to ensure that he faxed the driver's log, after which McPherson told him he had forgotten to do so.  (*Id.* ¶ 9.)  Michael then told McPherson to get in his car and take the driver's log to the specific union business agent.  (*Id.*)  McPherson, however, could not find the correct union agent, and therefore, gave the driver's log to the wrong union agent.  (*Id.* ¶

10.)  Here, UPSF does not dispute that this is Michael's version of why the driver's log was not delivered to the correct union agent for the grievance hearing nor does UPSF argue that Michael refused to deliver the driver's log.  Instead, based on this incident, UPSF, via Joseph, explained that Michael–who ultimately had the responsibility to ensure the delivery of the driver's log–did not perform up to UPSF's expectations because he did not follow through to ensure that the records were actually delivered to the right person.  (Ex. G, Joseph Dep., 85-86.)  Construing these facts in Michael's favor, UPSF's justification regarding the union hearing is not dishonest or a lie.

When evaluating pretext, the inquiry is not whether the stated reasons for the adverse employment action are inaccurate or unfair, but whether UPSF honestly believed its reasons for the actions.  *See Simpson v. Beaver Dam Cmty. Hosp., Inc.*, 780 F.3d 784, 795 (7th Cir. 2015). The record is replete with evidence that Hartman, the ultimate decision-maker, believed that Michael's performance and leadership abilities were lacking based on the September 2010 BPR audit results, the BSC numbers during Michael's tenure, and the labor hearing issue, especially because Michael was responsible for overseeing all aspects of freight operations and ensuring that the Chicago service center was operating in compliance with UPSF's business, financial, and service quality standards.  As such, Michael's subjective beliefs do not create an issue of material fact for trial, such as his belief that he took responsibility for the poor September 2010 BPR audit results and that his actions regarding the driver's log were appropriate.  *See Widmar v. Sun Chem. Corp.,* 722 F.3d 457, 462-63 (7th Cir. 2014).

Next, Michael points to evidence that UPSF treated similarly-situated, younger counterparts more favorably to support his age discrimination claim.  "A similarly situated

employee is one whose performance, qualifications, and conduct are comparable in all material respects." *Id*. at 463. The purpose of examining similarly situated employees "is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable–discriminatory animus." *Moultrie v. Penn Aluminum Int'l, LLC,* 766 F.3d 747, 753 (7th Cir. 2014) (citation omitted). Here, Michael sets forth evidence regarding Michael Clark, the service center manager for the Milwaukee, Wisconsin facility, and David James, the service center manager for both Portland and South Portland, Oregon facilities. Specifically, Michael argues that the Milwaukee facility's September 2011 BPR audit reveals that there were two Code-2 level violations in the safety and security indicating "severe" deficiencies in three separate processes, along with thirteen Code-3 level violations, yet UPSF did not discipline Milwaukee's service center manager Clark as a result of this score. Clark, however, is not comparable to Michael in all material respects because he was promoted to a RDO position in August 1, 2011, and it is undisputed that most of the records the audit team reviewed for Milwaukee's September 2011 BPR audit were created in the few weeks prior to the audit and well after Clark left the Milwaukee facility. (Def.'s Stmt. Facts ¶¶ 74-75.) In other words, Clark was no longer managing the Milwaukee facility when the audit team gathered data for the September 2011 audit. In addition, it is undisputed that there was no material disparity between Milwaukee's self-audit score and the September 2011 BPR audit score, as there was in relation to the September 2010 BPR audit of the Chicago facility. (*Id*. ¶ 77.)

Likewise, Michael argues that UPSF did not discipline James for the South Portland facility's poor July 2010 BPR audit. UPSF has presented evidence, however, that the South

Portland facility's service center manager was Christopher Sanders up until July 1, 2010, when UPSF terminated Sanders' employment for performance reasons. UPSF did not assign James to the South Portland terminal position until sometime in July 2010, which was in addition to James' continuing responsibility for the Portland terminal. Accordingly, James did not serve as South Portland facility's service center manager immediately prior to the July 2010 BPR audit like Michael had in relation to the September 2010 BPR audit of Chicago's facility. Instead, UPSF had just assigned James to the South Portland facility–in addition to his responsibilities at the Portland facility–to replace Sanders in July 2010. Even if James was comparable to Michael in this respect, there is no evidence in the record regarding a disparity between South Portland's self-audit score and the July 2010 BPR audit score or other indicia of James' lack of leadership, as is the case with Michael. Hence, Michael has failed to present evidence raising an issue of fact for trial that these employees were comparable in all material respects.

In addition, Michael presents other circumstantial evidence to support the inference that his age was the "but for" cause of his demotion and denial of his 2010 bonus. Specifically, he argues that UPSF's request that he release his legal claims against the company as a condition of his continued employment supports an inference of age discrimination. He further supports this argument with his deposition testimony that Boyle told him that if he did not sign the release, UPSF would fire him. (Pl.'s Stmt. Facts ¶ 12.) It is undisputed that Michael never signed the release and that he continued his employment with UPSF at its Toledo facility for approximately a year and a half until he retired. As such, the facts belie Michael's argument that signing the release was a condition of his continued employment with UPSF. Furthermore, Michael's assertion that Boyle told him that UPSF would fire him if he did not sign the release is hearsay to

which Michael does not offer an exception. *See Pyles v. Fahim,* 771 F.3d 403, 412 (7th Cir. 2014) (inadmissible hearsay not considered at summary judgment). Assuming Boyle made this statement during the conversation about Michael's demotion to the Toledo facility, Michael fails to present evidence that this conversation is connected to any indication that Boyle or UPSF demoted Michael due to his age. *See Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012). Further, standing alone, asking Michael to sign the release shows that UPSF was aware that it had potential liability for demoting an older worker, but it is well-settled that "[n]o inference of guilt can be drawn from awareness of one's legal obligations." *Partington v. Broyhill Furniture Indus., Inc.*, 999 F.2d 269, 271 (7th Cir. 1993).

Viewing the evidence and all reasonable inferences in Michael's favor, he has failed to present a "convincing mosaic" of circumstantial evidence raising a genuine issue of material fact for trial that UPSF demoted him and denied his 2010 discretionary bonus due to his age. Put differently, there is no evidence in the record that Hartman or any other decision-maker harbored any discriminatory animus based on Michael's age. *See Ripberger,* 773 F.3d at 880. The Court grants UPSF's summary judgment motion in this respect.

### B. Constructive Discharge

Next, Michael argues that UPSF constructively discharged him. "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Pennsylvania State Police v. Suders,* 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). To establish constructive discharge, Michael must show that his working environment became so intolerable or unbearable-from the standpoint of a reasonable employee-that retiring was an appropriate

response.  *See Garofalo v. Village of Hazel Crest,* 754 F.3d 428, 437 (7th Cir. 2014).

Constructive discharge takes on two different forms:  (1) an employee quits due to alleged

discriminatory harassment, which requires the employee to establish that his working conditions

were even more egregious than that required for a hostile work environment or (2) when the

employer acts in a manner that communicates to a reasonable employee that his employment will

be terminated.  *See Chapin v. Fort-Rohr Motors, Inc*., 621 F.3d 673, 679 (7th Cir. 2010); *Fischer

v. Avanade, Inc.,* 519 F.3d 393, 409 (7th Cir. 2008).

Because Michael does not argue that his working conditions were more egregious than

required for a hostile work environment claim, the Court turns to the second method of

establishing constructive discharge, namely, when "an employer acts in a manner so as to have

communicated to a reasonable employee that she will be terminated, and the plaintiff employee

resigns, the employer's conduct may amount to constructive discharge."  *Fischer,* 519 F.3d at

409.  In short, constructive discharge occurs when "based on an employer's actions, the

handwriting [was] on the wall and the axe was about to fall."  *Id.* (citations and quotation marks

omitted); *see also Hunt v. City of Markham, Ill.,* 219 F.3d 649, 655 (7th Cir. 2000)

("'constructive discharge' refers to the situation in which an employer, without firing an

employee, makes his working conditions so miserable that it drives him to quit.").  "This form of

constructive discharge, however, does not eliminate the need for the plaintiff to show that his

working conditions had become intolerable."  *Chapin,* 621 F.3d at 679.  Under this method of

establishing constructive discharge, Michael must present evidence creating a genuine issue of

material fact for trial that no reasonable person standing in his shoes would believe that had he

not retired, UPSF would have immediately fired him.  *See id.* at 680.

Here, Michael maintains that because he did not sign the release agreement, he worked at the Toledo facility under the fear that UPSF would terminate him. He further argues that his working conditions were intolerable because he suffered a drastic decrease in pay and UPSF relegated him to a facility with far less visibility and opportunity for advancement. In addition, Michael contends that the conditions in Toledo were intolerable because he had to relocate three hundred miles from family and friends in the Chicago area and missed important family events. This relocation, Michael posits, also contributed to damage to his home in St. Charles, Illinois. Last, Michael contends he did not relocate his family to Toledo because he could not afford to do so.

The Court views this evidence in the context that UPSF demoted Michael to the Toledo facility, therefore, the reduction of pay and changed opportunity in advancement speak to his demotion based on his job performance and lack of leadership at the Chicago facility, and not to whether UPSF's actions amounted to constructive discharge. *See, e.g., Fischer*, 519 F.3d at 409-10. In other words, because UPSF actually demoted Michael, there is nothing "constructive" about the reduction in pay and changed opportunity. As to Michael's fear that UPSF would terminate him because he did not sign the release form, "a working condition does not become intolerable or unbearable merely because a 'prospect of discharge lurks in the background.'" *Chapin,* 621 F.3d at 679 (citation omitted).

This leaves Michael's claims that the conditions in Toledo were intolerable because he had to relocate hundreds of from family and friends in the Chicago area and that he could not afford to relocate his family to Toledo. These claims, however, are based on conditions that are in Michael's control, and it is well-established that constructive discharge must be based on an

employer's conduct or actions.  *See Kodish v. Oakbrook Terrace Fire Prot. Dist.,* 604 F.3d 490, 502 (7th Cir. 2010); *Fischer,* 519 F.3d at 409.

Moreover, there is undisputed evidence in the record that Michael's job responsibilities remained the same in his new position in Toledo and that UPSF gave him a MIP bonus for 2011. (Def.s' Stmt. Facts ¶ 70.)  Also, Michael had no issues working with the RDO for Toledo and admitted at his deposition that he did not experience any incidents of discrimination or retaliation while he worked at the Toledo facility.  (*Id.*)

As such, construing the facts in Michael's favor, he has not presented evidence creating a material fact for trial that–based on UPSF actions–his discharge was immediate or imminent.  *See Chapin,* 621 F.3d at 680.  The Court therefore grants UPSF's motion for summary judgment as to Count I of the First Amended Complaint.

## II.    ADEA Retaliation Claim–Count II

In Count II of his First Amended Complaint, Michael alleges an ADEA retaliation claim. To avoid summary judgment, Michael may establish his ADEA retaliation claim under either the direct or indirect method of proof.  *See Hutt*, 757 F.3d at 693.  Michael chooses the direct method of proof under which he must show that:  (1) he engaged in statutorily protected activity; (2) he suffered an adverse action; and (3) a causal connection between the two.  *See id.*; *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012).

According to Michael, after UPSF passed him over for certain promotions, he complained to certain supervisors and human resource professionals, namely, Marino, Brown, Smith, and his former RDOs Bill Pittman and Frank Rodriguez, that UPSF passed him over for promotions due to his age.  (Pl.'s Stmt. Facts ¶ 4; Def.'s Stmt. Facts ¶ 33.)  Viewing the evidence

and all reasonable inferences in Michael's favor, he has set forth evidence creating a genuine issue of material fact as to the first element that he engaged in a statutorily protected activity by reporting age discrimination to his supervisors and to UPSF's human resources personnel. *See Chaib,* 744 F.3d at 986; *Andonissamy v. Hewlett-Packard Co.,* 547 F.3d 841, 851 (7th Cir. 2008).

Michael next argues that he can establish a casual connection between his 2010 demotion and his protected activity because he complained to RVP Steve Smith about UPSF's failure to promote him due to his age and that Smith and Boyle had recommended Michael's demotion to Hartman. Michael, however, fails to present any evidence supporting a reasonable inference that Hartman, the final-decision maker, had actual knowledge that Michael had complained about his age after being passed over for certain promotions. *See Smith*, 674 F.3d at 658; *Nagle v. Village of Calumet Park,* 554 F.3d 1106, 1122 (7th Cir. 2009); *Luckie v. Ameritech Corp.,* 389 F.3d 708, 714-15 (7th Cir. 2004). In short, Hartman could not retaliate against Michael for complaining about age discrimination if he did not know that Michael had made any such complaints. *See Luckie,* 389 F.3d at 714-15. In addition, Michael has not set forth evidence that Smith improperly influenced Hartman's decision to demote him under the "cat's paw" theory of liability. *See Brown v. Advocate South Suburban Hosp.,* 700 F.3d 1101, 1108 (7th Cir. 2012). Instead, the undisputed evidence shows that Hartman had independent knowledge of the facts supporting Boyle's and Smith's recommendation to demote Michael based on Hartman's own observations, review of the BSC numbers throughout Michael's tenure, involvement in the September 2010 BPR audit, and knowledge of the grievance hearing matter.

The Court grants UPSF's summary judgment motion as to Michael's retaliation claim

alleged in Count II of the First Amended Complaint because Michael has not set forth evidence raising a genuine issue of material fact that Hartman demoted him based on his protected activity concerning his age.

## CONCLUSION

For these reasons, the Court grants Defendant's motion for summary judgment and dismisses this lawsuit in its entirety.

**Dated:** May 26, 2015

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**